**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

SHELLY FENDER,                                    Case No. 1:11-cv-412

               Plaintiff,                         Spiegel, J.
                                                  Bowman, M.J.

   v.

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Shelly Fender filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). In response to the complaint, Defendant filed a motion to dismiss, arguing that the appeal was untimely (Doc. 6). Although the undersigned initially agreed and recommended dismissal, the presiding district judge rejected that Report and Recommendation, holding that equitable tolling should apply to permit Plaintiff to file her appeal. (Doc.10). Thereafter, Plaintiff filed a memorandum that asserts two claims of error, both of which the Commissioner disputes. Having reached the merits of Plaintiff's claims, I now recommend that the finding of non-disability be REVERSED, because it is based upon legal error and is not supported by substantial evidence in the administrative record.

### I. Summary of Administrative Record

Plaintiff filed an application for Supplemental Security Income ("SSI") in June

2006, alleging a disability onset date in April 2006 due to asthma and allergies. (Tr. 158-161). After Plaintiff's application was denied initially and upon reconsideration, Plaintiff requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). Plaintiff, represented by counsel, provided testimony at an evidentiary hearing held in February 2009 before ALJ Thomas McNichols. (Tr. 32-78). A vocational expert ("VE") also provided testimony. A second hearing was held in September 2009, at which a medical expert ("ME") and Plaintiff provided additional testimony. (Tr. 79-105). On September 28, 2009, ALJ McNichols issued a written decision, concluding that Plaintiff was not disabled and therefore not entitled to SSI benefits. (Tr. 10-24). On November 30, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, leaving the ALJ's written decision as the Commissioner's final determination.

In the "Findings" representing the rationale of his decision, the ALJ determined that Plaintiff has not engaged in substantial gainful activity, and suffers from the following severe impairments: "asthma (with environmental allergies); chronic low back pain; depression/anxiety; and obesity." (Tr. 12). However, considering all of those impairments, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15). Instead, the ALJ determined that Plaintiff retains the residual functional capacity ("RFC") to perform a range of light work, subject only to the following nonexertional limitations:

> [N]o lifting more than 10 pounds; no climbing ropes, ladders, or scaffolds;
> no balancing; the opportunity to alternate between sitting and standing at

30-minute intervals; no work on uneven surfaces (the claimant used a cane at the hearing with no evidence that it is medically-prescribed); no repetitive use of foot controls; no exposure to temperature extremes or humidity; no exposure to irritants; only low stress jobs that do not require production quotas; no requirement to maintain concentration on a single task for longer than 15 minutes at a time; and no exposure to the general public.

(Tr. 18).

The record reflects that Plaintiff is a high school graduate, and was 36 years old at the time of the ALJ's decision.  The ALJ determined, based upon the testimony of the vocational expert ("VE"), that Plaintiff was unable to perform her past relevant work as a restaurant manager and as a cashier.  However, based on additional testimony from the VE, and considering Plaintiff's age, education, work experience, and RFC, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform."  (Tr. 22). Thus, the ALJ concluded that Plaintiff was not under a disability and was not entitled to SSI benefits.  (Tr. 23).

In her appeal to this Court, Plaintiff argues that the ALJ erred: (1) in failing to find that Plaintiff's asthma met and/or medically equaled Section 3.03B of the Listing of Impairments; and (2) in failing to fully consider the impact of Plaintiff's obesity.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act.  See 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are

both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. . .. The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial

gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

### B. Plaintiff's Statement of Errors

Plaintiff's first assertion of error relates to the third step of the sequential analysis, while her second asserted error impacts the third through fifth steps of the sequential analysis.

### 1. Step 3 Error and Listing 3.03B

The fact that Plaintiff has long suffered from severe asthma is not in question in this case. What is in question is whether Plaintiff's asthma is of listing level severity, and specifically, whether her disease meets or equals Listing § 3.03B of 20 C.F.R. Pt. 303, Subpt. P, App. 1.

### a. The ALJ's Legal Error

The referenced Listing is met or equaled when a claimant suffers from asthma "attacks" of a severity which, "in spite of prescribed treatment," still require "physician

intervention." *Id.* The Listing contains a "frequency" requirement, requiring the claimant to show that her attacks occur

> at least once every 2 months or at least six times a year. Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

§3.03B. The relevant medical records in the administrative record reflect that, between her alleged disability onset and the date of the hearing, Plaintiff was treated at the emergency room approximately twenty times, and hospitalized for asthma-related symptoms on at least three separate occasions, for an average that clearly exceeded the requisite frequency requirement of "once every 2 months or at least six times a year."

Of course, the frequency of symptoms is only one component required to meet the Listing. In terms of the severity level required, the Commissioner further defines the term asthma "attacks" in §3.00C:

> C. Episodic respiratory disease. When a respiratory impairment is episodic in nature, as can occur with exacerbations of asthma, cystic fibrosis, bronchiectasis, or chronic asthmatic bronchitis, the frequency and intensity of episodes that occur despite prescribed treatment are often the major criteria for determining the level of impairment. Documentation for these exacerbations should include available hospital, emergency facility and/or physician records indicating the dates of treatment; clinical and laboratory findings on presentation, such as the results of spirometry and arterial blood gas studies (ABGS); the treatment administered; the time period required for treatment; and the clinical response. Attacks of asthma, episodes of bronchitis or pneumonia or hemoptysis (more than blood-streaked sputum), or respiratory failure as referred to in paragraph B of 3.03, 3.04, and 3.07, are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged

> inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting. Hospital admissions are defined as inpatient hospitalizations for longer than 24 hours. The medical evidence must also include information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs. For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

At the evidentiary hearing, the medical expert testified repeatedly that Plaintiff continuously met or equaled Listing §3.03B. The ME explained that Plaintiff satisfied the Listing based upon her "repeated attacks of asthma that require either emergency department intervention or specific (INAUDIBLE) intervention by her primary care physician or admission in June or no [sic] April of '06 at intervals of at least every two months or the equivalent of that through the present." (Tr. 90; *see also* Tr. 92-93, affirmatively responding that Plaintiff met the Listing continuously). Because the vast majority of Plaintiff's treatment for severe asthma attacks occurred in emergency rooms, the ME focused on that evidence. Although the transcript of the ME's telephonic testimony contains a number of "inaudible" portions, it is clear from the transcribed portions and from the context of his remarks that he believed Plaintiff's asthma to be much more severe than typically presented by most asthma patients seeking treatment in emergency rooms:

> [ALJ] Q. …[A]re you saying that all those circumstances are met during this period of time?
>
> [ME] A. Yes, sir.
>      ………….

A.  In other words, based on the nine years I've been doing this, a lot of times people who have asthma go in they won't be breathing. (INAUDIBLE) they come to the emergency room when they get there and they're not in respiratory distress, they don't have (INAUDIBLE).

Q.  Right.

A.  This lady has been described many times as having respiratory distress.  At one point she literally met the blood gas only because she was (INAUDIBLE) severe asthmatic attack (INAUDIBLE) from my experience.

Q.  Okay.

A.  Her blood gasses were so bad at that moment that she would have met the listing for that moment but she obviously (INAUDIBLE).  She is a severe asthmatic that is (INAUDIBLE) and contrary to this pulmonary function studies have never been severe enough to meet the listing and that's because it's primarily a reactive airway diseased person.

(Tr. 93-94).

In sharp contrast to the ME's focus on the frequency and intensity of Plaintiff's treatment in the emergency room, the ALJ focused exclusively on hospital admissions lasting more than 24 hours.  The ALJ adamantly refused to consider any evidence of ER treatment during which Plaintiff was treated for a period of fewer than 24 hours and released.

A review of the transcript illustrates the stark dichotomy of positions.  The ME repeatedly tried to explain why he believed Plaintiff met the Listing based upon the frequency of treatment required in the ER, as well as the type of treatment administered to her.  When he attempted to more fully articulate his position: "The way I interpret the

8

Commissioner's regulation is that," the ALJ interrupted him, asking him to re-focus instead solely on Plaintiff's hospital ***admission*** record.

> [ALJ] Q.  Do you understand what I'm saying?
>
> [ME]  A.  Yes sir, I understand what you're saying.
>
> Q.  Because you're again –
>
> A.  You're looking at admissions only.
>
> Q.  Right.

(Tr. 94).

Incredulous at the ALJ's refusal to consider Plaintiff's frequent need for physician intervention administered in an emergency room setting, the ME persisted, noting that such treatments were "in spite of prescribed treatment," as stated in the Listing:

> A.  But visits to the emergency room and her home program of inhalers that you've gotten to her to testify to failed.  And that's why (INAUDIBLE) because there's quite a prescribed treatment requiring physician intervention.  So she had to go in and get I think most of the time some (INAUDIBLE) treatment, lots of times IV's steroid.
>
> Q.  Okay.
>
> A.  There's intravenous steroids as well as respiratory therapy treatment.

(Tr. 95).  However, no matter how often the ME attempted to explain the ways in which he believed that Plaintiff's ER treatments met or equaled the Listing, the ALJ refused to consider any hospital-based treatment that lasted less than 24 hours.

After the ME's testimony documenting the intensity and serious nature of Plaintiff's ER treatment, the ALJ doggedly returned to the 24-hour issue:

Q.  And the hospitalizations would have – inpatient hospitalizations would have lasted longer than 24 hours?

A.  No, she was not admitted.  She stayed in the emergency room for less than 24 hours.

(Tr. 95).

The ALJ then omitted a critical phrase while quoting a selective portion of the regulation.  The ALJ explained that he read §3.00C as requiring "[p]rolonged symptomatic episodes lasting one or more days and requiring intensive treatment such as intravenous bronchodilator or antibiotic administration or prolonged inhalerization bronchodilator in a hospital or equivalent setting."  (Tr. 95).  The ALJ's selective quotation omitted "emergency room" from the definition.  The actual quotation indicates that the qualifying treatment may be administered "in a hospital, ***emergency room*** or equivalent setting."  §3.00C (emphasis added).  The ALJ then reasoned that, based upon language that treatment was required in "a hospital or equivalent," he was incorporating the definition of hospital *admissions* that immediately followed the description of *where* qualifying treatment could take place – only one of which locations was "in a hospital."  Thus, for a "treatment" for an "attack" to count toward the frequency requirement of §3.03B, the ALJ required that treatment both to be "in a hospital" and to be defined "as inpatient hospitalizations for longer than 24 hours at a time."  (Tr. 95).  In so doing, the ALJ effectively eliminated from the definition of "attack" any severe asthmatic episode during which treatment was administered in an "emergency room or

equivalent setting."  The ALJ's written opinion reflects the same viewpoint.  (*See* Tr. 15-16)

After listening to the ALJ's narrow definition, the ME admitted that Plaintiff's frequent severe episodes, requiring emergency room treatment, would not satisfy that definition of treatment in "a hospital or equivalent" because they did not result in admission for more than 24 hours.  The ALJ further commented, "a lot of people go to a hospital every time they have any kind of problem," a proposition with which the ME agreed.  (Tr. 96).  However, the ME reiterated that the records of Plaintiff's ER treatment for asthma reflect far more serious attacks and a need for treatment than the "typical" patients with whom the ALJ was concerned, who may present to the ER with symptoms that have been resolved by the time they reach the emergency room.  The ME further explained why he believed that §3.03B was satisfied based upon the particularly strong evidence of the severity of the symptoms for which Plaintiff sought ER treatment, and the intensity of the treatment administered to her:

> [ME] A.  But what I'm looking for in paragraph C is the definition and the explanation for an attack because asthma patients do come in, and she has described and I just described as well, that they come in and they arrive and they're no longer wheezing, they've responded but they still come in because they're scared and they're worried.  …

Contrasting Plaintiff's records, the ME explained:

> A.  Well, these are episodes [of Plaintiff's] in the emergency room that I see and I documented in the record, except for the three we've all agreed are admissions, the longest ones though are not admissions but they are physician interventions.  And when she arrived in the emergency room in need of (INAUDIBLE) she was in severe distress as described by the treating provider.  Now, sir, if you wish to say that – if it must be defined as

an admission of an encounter that lasted longer than 24 hours (INAUDIBLE) I would say that no, the majority of these do not fit that. *But what they do fit is a severe attack requiring the specific therapies that she was not able to give herself at home, such as intravenous medication and that's called intervention.* They were successful in reversing her attack in less than 24 hours. The treating physician (INAUDIBLE) go back home because she's an experienced asthma patient. If that's not acceptable then she does not meet it, if that is acceptable then she does (INAUDIBLE).

(Tr. 97)(italics added).

Only when faced with the ALJ's unyielding insistence that only those hospital admissions lasting more than 24 hours would suffice as qualifying treatment, did the ME concede the point. When asked again whether Plaintiff met or equaled the Listing, the ME stated:

A. By your definition she never met it, by mine if you'll accept the physician's encounter requiring therapy that she would not be able to give herself at home for the level of severity the treating physician required those interventions, she does.

(Tr. 97). Again citing the number of hospital admissions, the ALJ persisted: "So obviously the listings could not have been met or equaled…could they?" Finally, the ME responded, "[i]n your definition, no, sir." (Tr. 98).

Unsurprisingly, Plaintiff's counsel agreed with the ME's interpretation of the regulation, arguing that Plaintiff met Listing §3.03B based upon the medical records demonstrating her frequent need for physician interventions in the emergency room. In response to an inquiry from counsel, the ME reiterated that in his prior 9 years of experience, he had always considered the definition of severe "attacks" to include those requiring "an encounter in the emergency room." (Tr. 100). Plaintiff's counsel then

12

began to describe the numerous records of Plaintiff's ER treatment.  However, the ALJ held fast to his position:

> ALJ:  Again, those are ER exhibits but not admissions, correct?
>
> ATTY:  That's correct, Your Honor, emergency room visits for acute exacerbation of asthma.

(Tr. 104).   At counsel's response, the ALJ declined to listen to further evidence.  "I'm not going to require you…to go through all the rest….I understand your point."  (Tr. 104).

In short, the ALJ and the medical expert interpreted the "severity" requirement of §3.03B in fundamentally different ways.  The ALJ interpreted the regulation as requiring treatment in an emergency room that satisfied an additional time requirement equivalent to a hospital admission, by requiring treatment *in a hospital* lasting more than 24 hours in duration.   By contrast, the ME believed that the evidence that Plaintiff required treatment in an emergency room was itself sufficient, at least on the record presented,[1] without an additional showing that the ER treatment lasted for more than 24 hours.  The ME unequivocally testified that, under his interpretation and review of Plaintiff's records, Plaintiff continuously equaled §3.03B because she suffers from asthma "attacks" of a severity which, "in spite of prescribed treatment," still required "physician intervention." However, the ALJ insisted that the phrase in §3.00C, referring to treatment "in a hospital[,] emergency room or equivalent setting" was further qualified by the sentence

---

[1] By way of example, on at least two occasions Plaintiff required "immediate intervention to prevent significant morbidity" during her ER visits, which interventions included but were not limited to intravenous medications.  (*See* Tr. 411-412).

defining hospital admissions as "inpatient hospitalizations for longer than 24 hours."  (Tr. 98-99).  Only when required to apply the ALJ's extremely narrow interpretation of what qualifies as an asthma "attack" did the ME agreed that Plaintiff's frequent need for ER treatment would not satisfy the Listing.  (Tr. 99).

A review of the regulation itself leaves no doubt that the ALJ committed legal error, by redefining qualifying "attacks" in a manner contrary to the express regulatory language.  As discussed, § 3.03B draws its definition of an "attack" from the definition listed in §3.00C, a regulation that governs not only asthma, but also several other potentially disabling pulmonary conditions. As the latter regulation explains, the Listing is intended to focus on "the *frequency and intensity* of episodes that occur despite prescribed treatment." *Id.* (emphasis added). Thus, §3.00C expressly includes in the term "attacks" not only asthma episodes so severe as to require admission in an inpatient hospital setting, but, by use of a comma and the conjunctive "or," episodes of such severity as to require "intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged bronchodilator therapy in a hospital, **emergency room** or equivalent setting."  *Id.* (emphasis added).  The episodes themselves must be "prolonged" to the extent that a claimant must experience symptoms that last "one or more days"[2] but there is no requirement that *treatment* itself last "more than 24 hours"

---

[2]The Commissioner makes no claim, nor did the ALJ find, that Plaintiff's asthma symptoms did not last for "one or more days." Remand would not be required to make this determination because the record presented clearly demonstrates that Plaintiff's ongoing symptoms were of sufficient duration. Although the reference to "prolonged" symptoms lasting "one or more days" is not as definite as a durational requirement specified in hours as is required for hospital admissions, Plaintiff's symptoms on the record presented satisfy the requirement.  She testified that she uses her inhalers and her breathing

unless the claimant is seeking to count a single "attack" as two "attacks" based upon his or her hospital admission.

The ALJ erred by omitting and/or disregarding the words "emergency room" in the definition of §3.00C, (see Tr. 95), and compounded that error by requiring *all* qualifying treatment to satisfy the additional 24-hour durational requirement for an inpatient hospital admission.  The ALJ's interpretation effectively took a non-exclusive list of treatment involving physician intervention-  (1) hospital admission; (2) emergency room; or (3) equivalent physician intervention in some other setting  - and narrowed that list to just one location and type of treatment.

Not only was the ALJ's interpretation of §3.00C contrary to the express language of the regulation, but it rendered meaningless additional language in §3.03B.  As the ME explained at the hearing, §3.03B specifies that "[e]ach inpatient hospitalization for longer than 24 hours…counts as two attacks."  By inference, the ME reasoned that treatment in an ER, which ordinarily would last for less than 24 hours, would still count as one attack.  "My confusion comes from why would the Commissioner for a 24 or greater admission give [it] the equivalent of two attacks, if the concept of physician required intervention for less than 24 hours for a severe attack wouldn't be acceptable in an episode, I'm confused…"  (Tr. 98).

Reversal is mandated in the face of such clear legal error.  *See Cole v. Heckler,*

_____

machine on a daily basis, and that she reported to the hospital only as a last resort when her near-constant symptoms escalate to a dangerous level despite administration of those home medications. (*See, e.g.,* Tr. 350, physician's note advising Plaintiff to go to ER after two home nebulizer treatments failed to alleviate severe symptoms; Tr. 409, Plaintiff transported to ER by Life Squad from physician's

587 F. Supp. 496. 498 (W.D.N.Y. 1984)(reversing where ALJ improperly applied §§3.03B and 3.00C "in interpreting them to require hospitalization for inhalation treatment in order to establish intensive treatment of severe asthma attacks."); see also *Martinez v. Sec'y of Health and Human Servs.,* 933 F.2d 76, 78-79 (1st Cir. 1991)(per curiam, citing *Cole* and remanding on similar facts).  Given the strong testimony of the ME, the only question that remains is whether further fact-finding is necessary on the issue of whether Plaintiff meets or equals §3.03B.  A sentence four remand under 42 U.S.C. §405(g) provides the required relief in cases where there is insufficient evidence in the record to support the Commissioner's conclusions.  *See Faucher v. Secretary of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted).  In contrast, where all factual issues have been resolved and remand would merely involve the presentation of cumulative evidence, remand for an immediate award of benefits may be appropriate.  *Faucher*, 17 F.3d at 176; *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. App'x. 852, 865 (6th Cir. 2011).

    Despite the strong testimony of the ME, the undersigned recommends remand for further fact-finding.  The Listing makes clear that a failure to comply with prescribed treatment may disqualify a claimant from meeting or equaling the Listing, to the extent that the attacks must occur with the requisite severity "in spite of prescribed treatment." §3.03B.  As discussed below, the evidence concerning Plaintiff's compliance with treatment is ambiguous and requires further review.

---

office after feeling "crappy" for 3 days).

### b.  Additional Fact-Finding Required on Remand

The ME testified to his belief that Plaintiff's prescribed regimen of treatment "failed."  (Tr. 95).  However, based on his review of the records, the ALJ concluded that when Plaintiff made trips to the emergency room for physician interventions, "[s]ometimes she had taken her prescribed medication; other times she had not."  (Tr. 16).  The ALJ also stated that "[f]requent ER visits have found that the claimant had been off her medication for some period of time.  On most of those occasions, hospital notes indicated that the claimant had not taken prednisone for some significant period of time."  (Tr. 13).  The ALJ's lack of citation to many ER records challenges this Court's ability to determine whether substantial evidence exists to support his findings.[3]

In one of his few citations to ER records, the ALJ refers to Plaintiff's testimony that she was forced to stop taking Xolair due to the loss of insurance.  (Tr. 12, citing Exhibits 1F and 4F).  Based upon a different record, the ALJ suggests that the issue of insurance coverage, at least for "some" of Plaintiff's ER visits, was "unclear."  (Tr. 12).  However, the ALJ fails to cite to any particular record contradicting evidence that Plaintiff was unable to afford Xolair when she lost prescription insurance coverage. (*See* Tr. 305, 328, 335).  A claimant may not be faulted as "non-compliant" if she cannot afford the prescribed medication.  *See e.g., McKnight v. Sullivan*, 927 F.2d 241, 249 (6th Cir. 1990)(ALJ must consider inability to afford medical care).  In addition to the

---

[3]The ALJ's comment implies that Plaintiff failed to take the steroid prednisone as prescribed. However, Plaintiff's ER records do not reflect a continuous prescription for that medication.  (*See, e.g.,* Tr. 303, noting that "chronic steroid use is not recommended" and Tr. 410, short-term prednisone prescribed for 4-day period to control acute symptoms; *compare* Tr. 446, 450, 455, 464, reflecting frequent short-

referenced evidence that Plaintiff could not afford some of her medication, another ER record refers to the fact that Plaintiff had not been able to use one of her asthma medications due to a thrush infection,  (*see* Tr. 755), arguably another legitimate basis for discontinuing a medication.

Considering the relative lack of citation to pertinent ER records by the ALJ and this Court's conclusion that the cited records do not provide substantial evidence to support the ALJ's factual finding concerning Plaintiff's alleged noncompliance with her medication regimen, remand is required for further review of this issue. The undersigned recommends remand for further fact-finding, rather than a mandate of an award of benefits, because the undersigned's review of the records finds limited support for the ALJ's factual conclusion. (S*ee, e.g.,* TR 303, 306, 332, 345).  While that conclusion cannot be upheld on the record presented, given the errors in the ALJ's legal and factual analysis as noted, it remains possible (if perhaps unlikely) that the evidence ultimately could support a denial of benefits *if* Plaintiff's need for frequent emergency room treatment was not "in spite of" her prescribed treatment.  While the undersigned has attempted to review the relevant records, such additional review is more properly performed by the Commissioner on remand.

While remand is appropriate to consider the ambiguities in the record concerning Plaintiff's compliance with her prescribed treatment, another factual finding by the ALJ is more clearly erroneous.  The ALJ proclaimed: "Even considering, arguendo, that the

term steroid use prescribed in ER for acute symptoms).

frequency of the claimant's hospitalizations, when considered with intervening ER visits…might meet the numerical qualifications…, the seriousness or intensity of the claimant's conditions on those occasions do not medically equal the circumstances described in section 3.00(C).  Requisite documentation, at least with respect to results of spirometry and arterial blood gas studies, is lacking."  (Tr. 15-16).

Section 3.03B states that to satisfy the Listing, "the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction."  The evidence of record undermines the ALJ's finding concerning this issue.  First, the use of "should" makes clear that the requirement is discretionary, not mandatory.  The ALJ cited three pulmonary function studies that showed only mild to moderate impairment.  (Tr. 13).  However, the ME explained that Plaintiff does not have valid spirometric results in her records because she is so frequently and severely symptomatic that her physicians simply could not obtain valid results "between" attacks – because there were no such qualifying asymptomatic periods of time.  The ME testified that to perform a spirometric exam on Plaintiff, under the circumstances, would not have produced valid results.  (Tr. 101).

In addition, the ME repeatedly testified to the seriousness of the claimant's condition when she presented to the emergency room in acute respiratory distress, and to the intensity of the treatment administered by the ER physicians, explaining that the severity and intensity was precisely of the nature described in §§3.03B and 3.00C. Notably, the ALJ cited to no record evidence that contradicted the ME's testimony in this

regard.  *Accord Raisor v. Schweiker*, 540 F. Supp. 686 (S.D. Ohio 1982)(Spiegel, J., holding that ALJ decision terminating SSI benefits of asthma patient was not supported by substantial evidence, because evidence demonstrated that claimant met Listing §3.03B, and ALJ failed to give weight to testimony of consulting pulmonologist).

### 2. Consideration of Plaintiff's Obesity

In her second assertion of error, Plaintiff contends that the ALJ failed to apply Soc. Sec. Ruling 02-1p.  Plaintiff testified that she is 5' 2¼" and weighs approximately 166 pounds.  (Tr. 35).  Although the undersigned has already concluded that remand is warranted based upon Plaintiff's first assertion of error, additional factual findings concerning Plaintiff's second assertion of error are also appropriate on remand.

In *Diaz v. Comm'r*, 577 F.3d 500 (3rd Cir. 2009), as here, the ALJ agreed that the plaintiff's obesity was a "severe" impairment, but the Third Circuit remanded based upon ALJ's failure to comply with SSR 02-1p by considering - and explaining in his written analysis- the effects of morbid obesity at Step 3 and beyond.  Other federal courts, like the Third Circuit in *Diaz*, have held that a blanket statement that a claimant does not meet or medically equal any Listing is legally insufficient to comply with Step 3 of the sequential analysis, in the absence of additional analysis that provides a basis for that conclusion.  *See, e.g., Diaz, supra; Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007); *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-120 (3rd Cir. 2000).

To date, no *published* Sixth Circuit case requires an ALJ to articulate in any particular detail the manner in which a claimant failed to meet or equal a Listing.  As the

Commissioner points out, historically the Sixth Circuit has required only minimal articulation at Step 3 of the sequential analysis, *see Price v. Heckler*, 767 F.2d 281, 284 (6th Cir. 1985); *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 412 (6th Cir. 2006)(stating in a case where obesity was not severe, that "[i]t is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants.").  So long as the ALJ's decision as a whole articulates the basis for his or her conclusion, the decision may be affirmed.  *See Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985).

The problem in this case is that, at least arguably, the ALJ's analysis of the claimed impact of Plaintiff's obesity does not permit this Court to conduct meaningful judicial review.  This Court previously remanded another case in which the only analysis was contained in a statement that the plaintiff's "severe impairments do not meet or equal any applicable listing, *even when the additional and cumulative effects of obesity are considered (see SSR 02-1p*)."  *See, e.g., Clemmons v. Astrue,* Case No. 1:10-cv-902-SAS, 2012 WL 219512 at *4 (S.D. Ohio, Jan. 25, 2012), adopted by Judge Spiegel at 2012 WL 219512 (Feb. 21, 2012).   The ALJ gave even shorter shrift to the issue of obesity in this case, in that there is no analysis at all other than the inclusion of obesity in the list of "severe" impairments.  A silent record does not permit meaningful judicial review.

As the undersigned stated in *Clemmons*, at least two unpublished Sixth Circuit cases, as well as both unpublished and published cases from this district, support

21

Plaintiff's position that greater analysis of obesity may be required. *See id.,* at *4, *citing Reynolds v. Comm'r of Soc. Sec.,* 424 Fed Appx. 411, 2011 WL 1228165 *4 (6th Cir. April 1, 2011)(agreeing with Third and Fifth Circuits and holding that an ALJ must in fact "give an explained conclusion" as to why a claimant's impairment does or does not meet a potentially relevant Listing); *Kennedy v. Astrue*, 247 Fed. Appx. 761, 768 (6th Cir. 2007)(same); see *also Norman v. Astrue,* 694 F. Supp.2d 738, 741 (N.D. Ohio 2010)(where obesity is severe impairment, ALJ must do more than "mention the fact in passing."); *Motley v. Comm'r of Soc. Sec.*, Case No. 1:08-cv-418-SAS, 2009 WL 959876 (S.D. Ohio April 8, 2009)(remanding based upon failure to discuss evidence in light of analytical framework of Listing, including effect of obesity).

On the other hand, and to be fair, if the ALJ's failure to discuss obesity were the only error asserted, it is unclear whether remand would be required. Plaintiff's stated height and weight barely move her into the "obese" category, as opposed to merely overweight. (*See* Tr. 431, describing Plaintiff as "slightly overweight"). Plaintiff points to no medical evidence at all that obesity exacerbates her conditions – arguably a critical failing in light of the fact that it remains Plaintiff's burden of proof to show that she is disabled. *Contrast, Clemmons*, at *5 (citing numerous records reflecting that the plaintiff's morbid obesity, at 300 pounds, impacted her other severe impairments). Nevertheless, because the undersigned recommends remand on the issue of whether Plaintiff meets or equals Listing §3.03B for other reasons, the ALJ should additionally

consider the impact of Plaintiff's obesity both with respect to that Listing, and with respect to the overall sequential analysis of the disability determination.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT**:

1.  The decision of the Commissioner to deny Plaintiff SSI benefits be REVERSED and this matter be REMANDED under sentence four of 42 U.S.C. § 405(g);

2.  Consistent with this R&R, the ALJ should reevaluate: a) whether the frequency of intensive physician interventions for the treatment of Plaintiff's asthma occurred "in spite of prescribed treatment," given evidence that Plaintiff has been unable at times, for financial reasons, to obtain Xolair; and b) the impact of Plaintiff's obesity both with respect to Listing 3.03B, and with respect to the overall sequential analysis of the disability determination;

3.  As no further matters remain pending for the Court's review, this case be CLOSED.

 _s/ Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

SHELLY FENDER,                                          Case No. 1:11-cv-412

           Plaintiff,                         Spiegel, J.
                                         Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

           Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).